LEON'S FROZEN CUSTARD, INC., Plaintiff-Respondent-Cross Appellant,

v.

LEON CORPORATION and Ronald Schneider, Defendants-Appellants-Cross Respondents.†

Court of Appeals

*No. 92–3229. Submitted on briefs August 6, 1993.—Decided February 2, 1994.*

(Also reported in 513 N.W.2d 636.)

†Petition to review denied.

On behalf of the defendants-appellants-cross respondents, the cause was submitted on the briefs of *Franklyn M. Gimbel*, *Marna M. Tess-Mattner* and *Kathryn A. Keppel* of *Gimbel, Reilly, Guerin & Brown* of Milwaukee.

On behalf of the plaintiff-respondent-cross appellant, the cause was submitted on the briefs of *Charles J. Hertel* and *Michael D. Golden* of *Dempsey, Magnusen, Williamson & Lampe* of Oshkosh.

Before Anderson, P.J., Brown and Nettesheim, JJ.

BROWN, J. This case involves a trade name dispute between the Leon's frozen custard stand located in Milwaukee and the Leon's situated in Oshkosh. The Leon's of Milwaukee argues that the trial court erred by refusing to limit the Leon's of Oshkosh to its one stand located on Murdock Avenue in Oshkosh and instead allowing a twenty-mile radius around the Oshkosh stand for placement of additional stands. Leon's of Oshkosh cross-appeals, claiming that the twenty-mile radius was too limited and that it also should be allowed to serve fried foods. We affirm the trial court's finding that the Oshkosh Leon's acquired a name of its own in the Oshkosh area independent of the Milwaukee Leon's. We further affirm that this finding is limited to a twenty-mile radius for selling custard only.

In 1941, Leon Schneider opened a frozen custard stand on 27th Street and Oklahoma Avenue in Milwau-

kee called "Leon's." Leon also engaged in a custard-mix and custard-making equipment business. He incorporated the business in the late 1940's. Leon retired in 1981 and his son, Ronald, continued the business. On March 25, 1987, the corporation registered the trade name "Leon's Frozen Custard" with the Wisconsin Secretary of State.

In 1947, Leon permitted his mother, Anna, to open a frozen custard stand in Oshkosh using the same name, "Leon's Frozen Custard." The Oshkosh store was modeled after the Milwaukee store, had similar equipment and offered similar services. The two stores purchased custard from the same supplier, made the product from identical machines, used the same formulas, and had the same cartons, lids, bags, and hats with the "Leon's" name on them. Anna and a son, Jack, operated the Oshkosh store. Prior to her death in 1960, Anna transferred a one-half interest in the Oshkosh business to Jack and, after her death, Jack purchased the remaining half from Anna's estate.

On January 2, 1989, Jack sold the Oshkosh business to a partnership consisting of Michael Schraa and Vernon Rogers. The purchase agreement forbade Schraa and Rogers from selling fried foods under the "Leon's" name. Although it was not part of the written agreement, Jack told Schraa and Rogers that they would have to get permission from the Milwaukee Leon's before opening any other stores under the Leon's name. In 1990, Rogers left the partnership, leaving only Schraa. On March 8, 1991, Schraa opened a "Leon's Frozen Custard" store at a downtown shopping mall in Oshkosh. In addition to custard, the store also sold fried foods consisting of hamburgers, french fries and other foods.

The Milwaukee Leon's objected to Schraa's action. In response, on April 24, 1991, Schraa commenced this present action against the Leon Corporation and Ronald Schneider, seeking a declaratory judgment regarding his rights. The Milwaukee Leon's counterclaimed seeking a declaratory ruling of its own that it had a proprietary interest in Leon's name in Oshkosh.

The case was submitted to the trial court which heard testimony without a jury. At the trial's conclusion, the trial court, inter alia, granted Schraa the right to use the trade name at locations other than the Murdock situs, provided that the locations be within twenty miles of the Murdock Avenue store. The trial court further held that use of the Leon's name was limited to the sale of custard and, therefore, the sale of fried foods under the name was prohibited. Both parties appeal. Further facts will be forthcoming as necessary.

■

Our first task is to set forth the applicable law. "Leon's Frozen Custard" is a trade name used by both parties. It is entitled to protection when it has acquired a "secondary meaning." *Spheeris Sporting Goods, Inc. v. Spheeris on Capitol,* 157 Wis. 2d 298, 312, 459 N.W.2d 581, 587 (Ct. App. 1990). A secondary meaning is a mental identification of the trade name as a single source for the product. *Id.* The *Spheeris* court wrote: "The relevant consuming public must recognize the trade name as identifying and distinguishing a plaintiff's goods or services." *Id.* (citing *Echo Travel, Inc. v. Travel Assocs., Inc.,* 870 F.2d 1264, 1266-67 (7th Cir. 1989)). This protection extends to the business's reputation and goodwill. *Id.* Whether a trade name has acquired a secondary meaning is a question of fact. *Id.* at 311, 459 N.W.2d at 587.

There is no dispute that the Milwaukee Leon's has acquired a secondary meaning for its goods and services in the Milwaukee area. The dispute is whether this acquired secondary meaning also attached to Oshkosh such that the Milwaukee Leon's has control of the name in that area or whether the Oshkosh Leon's built up its own independent secondary meaning. Schraa argues that the Oshkosh Leon's built its own secondary meaning and he is the legal purchaser of that secondary meaning.

The Milwaukee Leon's notes that it was the initial user of the trade name. The Milwaukee Leon's cites *Miller Brewing Co. v. Anheuser-Busch, Inc.*, 676 F. Supp. 1436 (E.D. Wis. 1987), *aff'd*, 873 F.2d 985 (7th Cir. 1989), to say that a "common-law right to a trademark is based upon prior use, that is, the first use of the mark in connection with a peculiar line of business." *Id* . at 1466. The Milwaukee Leon's attaches great importance to the term "first use."

We agree with the Oshkosh Leon's, however, that "first use" does not necessarily give the user of that name the exclusive right to use the name. This is because, under common law, the owner's right to have protection of his or her property in a trademark only extends through the territory in which the trademark is known and from which it has drawn its trade. *See United Drug Co. v. Theodore Rectanus Co.*, 248 U.S. 90, 97-98 (1918); *Oklahoma Beverage Co. v. Dr. Pepper Love Bottling Co.*, 565 F.2d 629, 633 (10th Cir. 1977). *See also* RESTATEMENT (THIRD) OF UNFAIR COMPETITION § 19 & cmt. b (Tentative Draft No. 3, 1991).

This rule was underscored by the United States Supreme Court in *United Drug*. The Court stated that there is no inherent right in a trademark. *See United Drug*, 248 U.S. at 97. The property interest is derived

from the trademark's connection and association with a particular business or trade. The Court then wrote: "[T]he adoption of a trademark does not . . . project the right of protection in advance of the extension of the trade, or operate as a claim of territorial rights over areas into which it thereafter may be deemed desirable to extend the trade." *Id.* at 98.

The Court went on to say that the protection was limited to the territorial bounds in which the mark was used. *Id.* Thus, the concept of "first use" is necessarily tempered by territorial concerns.

The Milwaukee Leon's claims, however, that territorial concerns are only relevant when the question is whether a company may extend the use of a trade name to a foreign market or in markets far removed from the place of first use. It notes that *United Drug* involved the defendant's use of the plaintiff's trade name in Kentucky, an area far removed from the plaintiff's use of the name in the New England states and Canada. It also cites *Gessler v. Erwin Co.,* 182 Wis. 315, 193 N.W. 363 (1924), a case involving the right to use in foreign markets a trade name protected in the United States. It reasons that, especially with technology in today's world, an area eighty miles in diameter (the distance between Milwaukee and Oshkosh) is all one territory in reality. Since the Milwaukee Leon's had first use in this one contiguous territory, it should be protected.

We reject the argument for the simple reason that the issue is one of fact as to the territorial range of the old market and whether the disputed market was a "new" market when the trade name began its association with the particular community. *See United Drug,* 248 U.S. at 98-99. There is no evidence that the Milwaukee Leon's had any reputation or goodwill in Oshkosh when Anna first opened the Leon's in Osh-

241

kosh in 1947. The only evidence is that Anna's Oshkosh Leon's built up its own reputation in the Oshkosh community over the years. The trial court specifically so found and that finding is not clearly erroneous. Section 805.17(2), STATS.[1]

Based on this understanding of the law, the Milwaukee Leon's' next argument must also fail. The argument is that because the *United Drug* Court wrote that a secondary user must select and use the name innocently and because Schraa's actions were not in good faith, the Oshkosh Leon's may not avail itself of the territorial exception to the first use doctrine. The Milwaukee Leon's points out that Jack warned Schraa, prior to the sale, that Schraa would have to get permission from the Milwaukee Leon's before opening up any Leon's stores other than the Murdock Avenue location. When Schraa went ahead and opened up the downtown Oshkosh location without permission, it was not done in good faith.

The reason the argument fails is because we look not to when Schraa bought the business when examining good faith. Rather, we examine the good faith of the person who set up the business in the new territory in the first place. *Cf. Money Store v. Harriscorp Fin., Inc.,* 689 F.2d 666, 674-78 (7th Cir. 1982). That person was Anna. There is nothing in the record to indicate that her possession and use of the Leon's name was anything other than innocent and permitted. It was she and her son Jack who built up the goodwill. It was she who sold half of her interest to Jack in 1960 and it was Jack who bought the remaining interest. Jack then

---

[1] There is also no evidence that the Milwaukee Leon's owned or even operated the Oshkosh Leon's such that it can be said to be the actual controller of the goodwill and reputation built up in the Oshkosh community.

owned the goodwill and reputation of the Oshkosh Leon's. He had the right to assign what he could lawfully claim. *Morris F. Fox & Co. v. State,* 229 Wis. 44, 49, 281 N.W. 666, 668 (1938). Schraa bought the rights that Jack lawfully assigned. The good faith argument falls short.

A corollary argument of the Milwaukee Leon's meets the same fate. This argument is that the extent of the Oshkosh Leon's' reputation and goodwill is limited to the Murdock Avenue location. Again, we note that this is an issue of fact; that is, assuming that a business has acquired a secondary meaning, it is for the trier of fact to determine the territorial range of the secondary meaning. Here, the trial court had evidence of the agreement between Jack and Schraa. Jack agreed that for a period of five years he would not directly or indirectly engage in a competing business within a radius of twenty miles from Oshkosh. From this document, the finder of fact could infer that the Oshkosh business considered its secondary meaning to have a twenty-mile geographical radius. That inference is not clearly erroneous. Section 805.17(2), STATS.

The Milwaukee Leon's complains that it was not a party to the contract and, therefore, the twenty-mile radius discussed in the contract is not binding on it. The Milwaukee Leon's misses the point. The point is that the trial court could use all probative facts elicited at trial to determine the territorial scope of the secondary meaning in Oshkosh. Since Jack owned the secondary meaning, the contractual agreement he entered into was probative of his understanding as to the scope of the secondary meaning owned by him.

The Milwaukee Leon's' remaining argument does not help it on its appeal, but does benefit it on the cross-appeal. The Milwaukee Leon's notes that it registered

243

its trade name before the Oshkosh Leon's. It points out that while registration alone does not grant it the exclusive use of a trade name throughout Wisconsin, it is prima facie evidence of the adoption of the trade name. Section 132.031, STATS. It further observes that the party claiming the right to use another party's registered trade name bears the burden of proving by a preponderance of the evidence that its use of the trade name is protected under common law. *See Miller Brewing*, 676 F. Supp. at 1466. It then claims that the Oshkosh Leon's failed to meet its burden of showing that its use of the trade name is protected under common law.

We have already held that the trial court's ruling attaching ownership of a secondary meaning in the Oshkosh community to the Oshkosh Leon's means that whoever owns the Oshkosh Leon's has a proprietary interest protected by common law. So, the argument fails as to the appeal. However, on this cross-appeal, Schraa seeks reversal of the twenty-mile limitation on the trade name he bought from Jack. Here, the statutes and accompanying case law on trade name registration work in the Milwaukee Leon's favor. The Oshkosh Leon's never extended its secondary meaning beyond the Oshkosh community. That was the trial court's finding. As such, Schraa has bought nothing protectible under common law beyond Oshkosh. As we have already stated, an assignment covers only what the assignor may lawfully claim. Jack could not sell Schraa a proprietary interest in the Leon's trade name beyond the Oshkosh community because his business had not acquired a secondary meaning beyond the Oshkosh community. Since the Milwaukee Leon's registered first in this state, it is the prima facie owner beyond Oshkosh. Since Schraa has no legally pro-

tectible interest in common law, he has not met his burden of showing that he has any right to use the Leon's name beyond Oshkosh. Schraa's claim fails.

So does Schraa's claim that the trial court erred in forbidding the Oshkosh Leon's to sell fried foods at the mall location in downtown Oshkosh. The contract between Jack and Schraa specifically forbade the Oshkosh Leon's from selling fried foods. Schraa argued before the trial court that the prohibition is limited to the Murdock Avenue location. The trial court found otherwise, ruling that the intent of the document was to allow Schraa's use of the Leon's name conditioned upon a restriction that no fried foods be sold under the name.

■

Although Schraa does not repeat the foregoing argument on appeal, he continues to claim as he did in the trial court that the Milwaukee Leon's has no standing to argue for a court declaration prohibiting the sale of fried foods. Schraa misses the point. He requested the court for a declaration of rights under the contract. "Any person interested under a . . . written contract . . . may have determined any question of construction or validity arising under the . . . contract . . . and obtain a declaration of rights, status or other legal relations thereunder." Section 806.04(2), STATS. *See also* EDWIN E. BRYANT ET AL., CALLAGHAN'S WISCONSIN PLEADING AND PRACTICE § 64.05 (3d ed. 1986). Schraa asked for a construction of his rights and that is what he received. The court ruled that he owns the secondary meaning established by the prior owners of the Oshkosh Leon's. With that ownership comes certain rights, but also certain limitations. The trial court found that the Oshkosh Leon's did not sell fried foods at the Murdock Avenue location because it was a "distinguishing feature" of the

trade name. It further found that the Oshkosh Leon's would not serve fried foods for fear that the foods would dilute the quality of the custard. When Schraa bought the trade name, he also bought the limitation. He owns only what was sold to him. What was sold to him was the Leon's name for use in selling custard only, not fried foods. He cannot continue to use the name and serve fried foods as well. That would go beyond what he bought. Schraa thus received a complete declaration of all his rights under the contract. The trial court delivered on his request. He cannot complain.[2]

*By the Court.*—Judgment affirmed.

---

[2] We feel compelled to comment on the dissent. The dissent begins with the supposition that Anna did not adopt the Oshkosh trade name in good faith, but rather operated the Oshkosh Leon's with the *consent* of Leon. The dissent then cites case law saying that consent, once given, may be unilaterally terminated where the user has reason to know that the other party is no longer willing to permit the particular use. The dissent concludes that Schraa knew he was limited to the Murdock Avenue location because the consent was circumscribed in that manner. The major problem with the dissent's reasoning is that nowhere, either in the trial court record or in the briefs on appeal, did the Milwaukee Leon's raise whether Anna adopted the trade name in good faith. Also, nowhere did the Milwaukee Leon's argue that "consent" and "termination of consent" were the cornerstones of its claim. In fact, the law cited by the dissent was never cited, let alone mentioned. Whatever the merits of the dissent's reasoning, the theory was never brought to the attention of the trial court. Appellate courts are not at liberty to reverse cases on appeal based on theories of law never argued in the trial court. Nor are appellate courts authorized to make findings never considered by the trial court, which the dissent appears to do here.

ANDERSON, J. (*dissenting in part*). I dissent from the portion of the opinion affirming the trial court's decision allowing Schraa the right to use the "Leon's" trade name within a twenty-mile radius of the Murdock Avenue location. Schraa's right to use the trade name did not derive from a good faith adoption of the trade name by the Oshkosh business, but through the consent of the Milwaukee Leon's. The Milwaukee Leon's had the right to limit its consent to the Murdock Avenue location only. Because the Milwaukee Leon's informed Schraa prior to the purchase that consent was limited to the Murdock Avenue location, Schraa had no right to use the name at other locations.

The majority opinion rejects the Milwaukee Leon's argument that the territorial exception to the first use doctrine is not available to the Oshkosh Leon's. The majority reasons that Anna's adoption of the trade name was in good faith as required by *United Drug Co. v. Theodore Rectanus Co.*, 248 U.S. 90 (1918) because "[t]here is nothing in the record to indicate that her possession and use of the Leon's name was anything other than innocent and permitted." Majority opinion at 8.

Contrary to the majority opinion, the general rule established by case law and commentary is that proof of *knowledge* of the prior user's mark is sufficient to destroy the good faith defense discussed in *United Drug. See* 2 J. THOMAS MCCARTHY, MCCARTHY ON TRADE-MARKS AND UNFAIR COMPETITION § 26.03, at 26-14 to 26-15 (3d ed. 1992).[3] McCarthy notes that *United Drug*

---

[3] Cases cited in support of the majority view include *Money Store v. Harriscorp Fin., Inc.*, 689 F.2d 666, 674 (7th Cir. 1982) (a good faith user is "one who begins using a mark with no knowledge that someone else is already using it"); *Weiner King, Inc. v. Wiener King Corp.*, 615 F.2d 512, 522 n.6 (C.C.P.A. 1980)

and *Hanover Star Milling Co. v. Metcalf,* 240 U.S. 403 (1916), the landmark cases discussing geographically remote use, contain language which could support the argument that more than mere knowledge is required. However, McCarthy recognizes that more recent cases have read good faith very narrowly to protect only those users who have no knowledge of a prior user.

The Oshkosh Leon's cites to no Wisconsin precedent which would lead me to believe that Wisconsin's common law differs from the general rule. In the absence of such controlling precedent, I would follow the general rule and hold that Anna did not adopt the trade name in good faith.

Although Anna could not avail herself of the defense of a good faith adoption in a remote market, the parties agreed that Milwaukee Leon's consented to the use of the trade name. Consent is also a defense to the infringement of a trade name. *See* RESTATEMENT (THIRD) OF UNFAIR COMPETITION § 29 (Tentative Draft No. 3, 1991). A consent agreement operates to limit the risk of confusion to the purchasing public by controlling how the name is used by one or both of the parties. *Id.* at cmt. b. By obtaining consent, the new user and successors may use the mark within the scope of the consent. *Id.* at § 29 & cmt. a. However, this consent may be terminated where the user knows or has reason to know that the other party is no longer willing to permit the particular use. *Id.* at cmt. d.

There were no findings of fact as to the scope of the original consent agreement between Anna and the Milwaukee Leon's or whether the parties agreed at a later

(the appropriation of a mark with knowledge that it is being used by another is not in good faith); *Pike v. Ruby Foo's Den, Inc.,* 232 F.2d 683, 686 (D.C. Cir. 1956) (stating that the federal cases are "virtually unanimous against a knowing junior user").

time to limit the consent. Nevertheless, the trial court did find that Schraa was "warned in regard to obtaining permission to use the name at other locations prior to opening any other locations." Ronald testified that prior to the sale he informed Schraa that he would not permit anyone to open additional stores using the name "Leon's." Jack also testified that he informed Schraa that Ronald's permission would have to be obtained before opening other businesses using the "Leon's" name.[4] Vernon Rodgers, a former business partner of Schraa's, testified that Jack told them they would need permission to open another store under the "Leon's" name. I would hold that these facts indicate that Schraa knew or had reason to know that consent to use the "Leon's" trade name extended to the Murdock Avenue location only.[5]

---

[4] Jack's statement that permission was needed to open additional stores was not based on his interpretation of the consent agreement, but on his belief that registration of the mark precluded anyone else from opening additional stores without the Milwaukee Leon's permission.

[5] There was also evidence presented by the Milwaukee Leon's which could support the argument that the consent agreement rose to the level of a license between the parties. Because the trial court decided the case on other grounds, there was no determination of whether a license existed. A license entitles a licensee to exploit the trade name owner's goodwill by a use which purchasers would attribute to the trade name owner. RESTATEMENT (THIRD) of Unfair Competition § 29 cmt. b (Tentative Draft No. 3, 1991). To constitute a license, the owner must exercise adequate control over the licensee's use. *Id.* at cmt. b & § 33. Licensing differs from a consent agreement because a consent agreement does not contemplate that the use of the mark by one party will be attributed by the public to the

other. *Id.* at § 29 cmt. b. However, a license without adequate control is effective as a consent agreement between the parties. *See id.* Therefore, the distinction is not necessary to determine the rights of the parties for purposes of this suit. Because the distinction could be important in the future, especially as to third parties, I would note that it is left unresolved whether a license existed between the parties.